UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOHN LAMBRINOS,

Plaintiffs,

vs 1:00-CV-1734

EXXON MOBIL CORPORATION; and
DONALD GAGNIER,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| APPEARANCES: | OF COUNSEL: |
|---|---|
| POKLEMBA, HOBBS & ULASEWICZ, LLC<br>Attorneys for Plaintiffs<br>Suite 307<br>358 Broadway<br>Saratoga Springs, NY 12866 | GARY C. HOBBS, ESQ. |
| McCUSKER ANSEIMI ROSEN<br>CARVELLI & WALSH, PA<br>Attorneys for Defendant, Exxon Mobil<br>42nd Floor<br>405 Lexington Avenue<br>New York, New York 10174 | JOSEPH T. WALSH, III, ESQ. |
| LIVINGSTON L. HATCH, ESQ.<br>Attorney for Defendant Gagnier<br>1790 Main Street<br>P.O. Box 345<br>Keeseville, New York 12944 | |

DAVID N. HURD
United States District Judge

**MEMORANDUM-DECISION and ORDER**

## I. INTRODUCTION

John Lambrinos ("plaintiff" or "Lambrinos"), owner of Gus' Red Hots, Inc, and Norman Landry, owner of The Rip Van Winkle Motel, brought suit pursuant to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, against defendants Exxon Mobil Corporation ("defendant" or "Exxon") and Donald Gagnier for conduct related to the contamination of their real property.[1]

It was determined at summary judgment that defendants are liable pursuant to §181 of New York State's Navigation Law ("N.Y. NAV. LAW") and thus the remaining issue in this action is the amount of damages to be awarded to cover the cost of the cleanup of the Lambrinos' property.[2] Logically, the damages correlate with the scope of the cleanup required, which is an issue for a jury.

Pursuant to Fed. R. Evid. 702 ("Rule 702"), both Lambrinos and Exxon have filed Daubert motions regarding the other's experts as they are expected to testify at the trial for damages. Both motions were opposed. Defendant also filed motions in limine to bifurcate the trial of plaintiff's claim for punitive damages and to bar certain evidence it concludes is irrelevant.

While these motions were pending, defendant's motion for a Daubert hearing regarding plaintiff's expert, Alan Liptak ("Liptak"), was granted and a hearing was held in

---

[1] Norman Landry reached a settlement with the defendants and is no longer a plaintiff. (Docket No. 124, Stipulation of Dismissal.)

[2] Also at summary judgment, both plaintiffs and defendants moved for partial summary judgment as to defendant's liability under the RCRA. The motions were denied. See Lambrinos v. Exxon Mobil Corp., No. 00-CV-1734, 2004 U.S. Dist. LEXIS 19598, at *2 (N.D.N.Y. September 29, 2004).

Utica, New York on May 9, 2006. Decision was reserved. The parties were granted leave to file Proposed Findings of Fact and Conclusions of Law relative to the hearing. Both parties filed submissions which were received and considered in the disposition of the Daubert motion.[3]

## II. BACKGROUND

The factual background relating the circumstances of contamination at Gus' Red Hots Restaurant (the "restaurant") on the Lambrinos' property was related in Lambrinos v. Exxon Mobil Corp., No. 00-CV-1734, 2004 U.S. Dist. LEXIS 19598, at *2 (N.D.N.Y. September 29, 2004.) Familiarity with those facts is presumed and only the additional facts which are relevant to the Daubert hearing are related here.

As noted above, in determining that the defendant was liable under N.Y. NAV. LAW § 181, it was also determined that "the appropriate remedy and the amount and allocation of damages under state law remain for trial." Id. at *23. Liptak, a certified and licensed geologist then employed by Griffin International, prepared a Corrective Action Plan ("CAP") for the cleanup of the plaintiff's property.[4] The CAP's stated objective is to set forth the most suitable methodology "to return the soil and groundwater quality to uncontaminated condition to the degree possible." (Plaintiff's Daubert Hearing Ex. 2, Liptak's CAP, p. 1.) The CAP has

---

[3] After reviewing defendant's post-hearing submission, plaintiff submitted objections to defendant's Exhibit B – Federal Remediation Technologies Roundtable Remediation Technology Screening Matrix and Reference Guide Version 4.0 ("Federal Matrix") – asserting that the document should not be considered on the motion as the plaintiff did not have the opportunity to discuss, analyze or explain Liptak's use of the document. Defendant responded urging the court's consideration of the document.

The Federal Matrix has been considered. Not only was it cited in Liptak's expert report (CAP, referenced below, at 22.), but plaintiff had notice at the hearing that defendant would address the use of the matrix in post-hearing submissions. (Tr. 155-57)

[4] Liptak is now employed as an Environmental Program Manager at KAS, Inc.

a "target threshold of non-detectable volatile organic compounds." Id. at 18. At the Daubert hearing, Liptak explained that he consulted several resources in formulating his CAP. (Docket No. 31, Transcript of Daubert Hearing, May 9, 2006, 21-24) ("Tr. ___").

The Division of Environmental Remediation of New York Department of Environmental Conservation (NYDEC) issues Technical and Administrative Guidelines ("TAGMs") articulating the agency's policies in order to provide its staff with guidance for identification, investigation and remediation of contaminated waste sites. Liptak reviewed two TAGMs, TAGM: #4030 - Selection of Remedial Actions at Inactive Hazardous Wastes Sites ("TAGM 4030") and TAGM #4046: Determination of Soil Cleanup Objectives and Cleanup Levels ("TAGM 4046"). TAGM 4046 explains: "The cleanup goal of the Department is to restore inactive hazardous waste sites to predisposal conditions to the extent feasible and authorized by law. However, it is recognized that restoration to predisposal conditions will not always be feasible." (TAGM 4046, 1.) "This TAGM provides a basis and procedure to determine soil cleanup levels [at various site classifications], when the Director of the DHWR determines that cleanup of a site to predisposal conditions is not possible or feasible." Id.

Liptak also explained that he assessed the various remedial options in light of the Federal Remediation Technologies Roundtable Remediation Technology Screening Matrix and Reference Guide Version 4.0 ("Federal Matrix"). The matrix was developed with input from a variety of technical experts, including site remediation technology researchers, technology developers, and technology users from federal agencies, state governments,

universities, and the private sector.[5] The matrix addresses more than forty-eight remediation technologies, which are evaluated in relation to thirteen factors ranging from performance to cost.

In his CAP, Liptak discusses six remediation alternatives, discounts five of them and then recommends excavating the property.[6] Actually, the parties have agreed to substantial excavation of the site. Unlike the defendant however, Liptak has concluded that the soil underneath the restaurant must be excavated. (CAP 9.) This recommendation is based on his interpretation of the soil boring data and some limited testing conducted at the site. Liptak interpolated the soil sampling data measured around the building and concluded that the soil beneath the building is contaminated.

> There are no data points on the map within the outlines of the buildings, so the standard geological practice is to interpolate the data between the data points.
>
> . . .
>
> You look at the numbers of two adjacent data points. In this case we do have some data points that are located around the buildings. So we are able to make an educated judgment as to what is underneath the buildings by looking at the relevant values of the data points located on either side.

(Liptak, Tr. 28.)

Also, KAS, Inc.("KAS") , Liptak's present employer, conducted testing under the restaurant to determine whether contaminants were present. (Docket No. 100, KAS December 7, 2004, Report; Tr. 34.) KAS concluded that the soil contained benzene

---

5 The Federal Matrix is made available for public use at http://www. frtr.gov/matrix2/top_page.

6 The alternative methods include soil vapor extraction (SVE) with air sparging, groundwater pump and treat, dual phase extraction, chemical oxidation and enhanced natural attenuation. (CAP 1.)

concentration in excess of NYDEC standards and there was a detectable impact of gasoline releases in the building foundation. Id. at 3.

Liptak opines that the alternative methods for addressing the contamination under the building would not be successful in restoring the soil to pre-spill condition. He concluded that enhanced natural attenuation may only work right where oxygen is injected but not over the whole area. (Tr. 64.) He rejects the defendant's proposed method of horizontal drilling and injecting peroxide because it would generate heat and gas under the building with uncertain consequences. (Tr. 62-63.)

In sum, with the understanding that the property must be restored to pre-spill levels, and that alternative methods would not be effective in attaining that goal, Liptak concluded that the soil beneath the building must be removed. (Tr. 43, 45-46, 76-77.) He did not express a preference or expert opinion as to how this is would be accomplished. (Tr. 66.)

## III. DISCUSSION

### A. Daubert Standard

"In Daubert, the Supreme Court made clear that the district court has a 'gatekeeping' function under Rule 702, and is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Wills v. Amerada Hess Corp., 379 F.3d 32, 48 (2d Cir. 2004) cert. denied, 126 S. Ct. 355 (2005) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993)). The district court is to make certain that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

Rule 702 requires that expert testimony be: (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) applied reliably to the facts of the case. Fed. R. Evid. 702. "Although Rule 702 sets forth specific criteria for the district court's consideration, the Daubert inquiry is fluid and will necessarily vary from case to case." Amorgianos v. Amtrak, 303 F.3d 256, 266 (2d Cir. 2002).

Factors for consideration in assessing reliability include, but are not limited to: "(1) whether a theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a high known or potential rate of error; and (4) whether it is generally accepted in the relevant scientific community." Wills, 379 F.3d at 48 (citing Daubert, 509 U.S. at 592-94). In addition, "reliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions." Nimely v. City of New York, 414 F.3d 381, 396-397 (2d Cir. 2005).

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." Amorgianos, 303 F.3d at 266.

**B. Plaintiff's Expert - Alan Liptak**

Defendant urges that Liptak's CAP and expert testimony is unreliable, and therefore inadmissible, because (1) he is not qualified to testify regarding human health issues and (2) his CAP is not scientifically valid.

1. **Alleged Threat to Health and the Environment**

During the course of his work related to the Lambrinos' property, Liptak has referred to the goal of his remediation plan as to "return the soil and groundwater quality to uncontaminated condition to the degree necessary to alleviate the threat of an imminent and substantial endangerment to health or the environment." (Docket No. 63, Liptak Aff. April 23, 2003.) As the defendant reads the record, this type of statement necessitates a fact-finding as to whether his expert opinion regarding a threat to public health or the environment has a sufficient basis under Rule 702. No such fact finding is required.

It is clear from the CAP and Liptak's hearing testimony that his analysis of the appropriate remediation method was conducted in an effort to restore the property to a pre-spill condition. Indeed, considering the previous finding of liability pursuant to N.Y. NAV. LAW § 181, that is the relevant standard. The fact that Liptak stated that he considered the effect of the contamination on human health and the environment – the standard listed in the RCRA – does not alter his testimony as to the relevant standard under N.Y. NAV. LAW § 181 – pre-spill condition. Thus, defendant's argument that Liptak's inability to conclusively demonstrate that the contamination at issue is a threat to human health and the environment is of no avail in precluding his testimony because that is simply not the relevant standard.

2. **Scientific Validity of Liptak's CAP**

Exxon argues that Liptak's CAP and testimony are unreliable in that (a) his conclusion that the soil under the building must be excavated is the result of bias and is not feasible, and (b) he failed to follow industry standards in formulating his CAP.

a. **Feasibility**

Exxon argues that Liptak's conclusion that the soil beneath the restaurant must be excavated renders his opinion unreliable because it is too extreme a measure and ignores the applicable law's feasibility requirement. A review of the applicable law is required before addressing defendant's argument.

N.Y. NAV. LAW § 181 provides that: "Any person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained." NYDEC is charged with implementing regulations to accomplish that purpose. See N.Y NAV. LAW § 191 (McKinney's 2004); 6 N.Y.C. R. R. § 611.1 (2006). Section 616.6 - Cleanup and Removal, lists the objectives of the removal phase, including "the restoration of the environment to its pre-spill conditions." 6 N.Y.C. R. R. § 611.6 (a)(4).[7]

Case law interprets this legal authority as requiring remediation beyond what would be acceptable according to the NYDEC's standards, all the way to pre-spill conditions. In AMCO Int'l., Inc. v. Long Island Railroad Co., for example, New York's Appellate Division upheld a lower court determination requiring just such remediation. 302 A.D.2d 338 (N.Y. App. Div. 2d Dep't. 2003) Despite the defendant's argument that the contamination at the property was below NYDEC standards, remediation was required because the trial court had credited evidence that there were still contaminants existing in the soil above pre-spill condition.

[7] "Although the regulation states the responsibilities of NYSDEC, it has been interpreted by courts to state the objectives of cleanup undertaken by non-state parties." Kara Holding Corp. v. Getty Petroleum Marketing, Inc., No. 99-CV-275, 2004 U.S. Dist LEXIS 15864, *44 (S.D.N.Y. August 12, 2004) (citing Matera v. Mystic Transp., Inc., 308 A.D.2d 514, 517-18 (2d Dep't 2003) and AMCO Int'l v. Long Island Railroad Co., 302 A.D.2d 338, 340 (App. Div. 2d Dept. 2003)).

AMCO Int'l, 302 A.D.2d at 338; see also Matera v. Mystic Transp., Inc., 308 A.D.2d 514, 518 (N.Y. App. Div. 2d Dep't. 2003).

A federal court, citing AMCO and Matera, has held likewise. In Kara Holding Corp. v. Getty Petroleum Marketing, Inc., the court denied summary judgment for the defendant on damages under N.Y. NAV. LAW despite the fact that it was paying for remediation of the plaintiff's property under the guidance and approval of NYDEC because the plaintiff raised a question of fact as to whether the property was being restored to pre-spill condition. No. 99-CV-275, 2004 U.S. Dist LEXIS 15864, *44-45 (S.D.N.Y. August 12, 2004).

Exxon has not distinguished this case law or pointed to any contrary authority. Accordingly, the property must be restored to the pre-spill condition, if it is feasible. Defendant argues that removal of the soil is not feasible because it is an extraordinary, extreme remediation effort. Defendant explains that where it has been done, the circumstances were not analogous to the instant case. Those rare cases involved smaller residential properties and well water quality. Indeed, plaintiff concedes that excavating under buildings is unusual. (Tr. 134.)

However, defendant has not presented authority for the proposition that rarity of the measure equates to feasibility of the measure.[8] Plaintiff points out, and defendant has not denied, that almost all remediation of this type is conducted by parties with a financial

---

[8] Defendant repeatedly points to an August 2003 phone conversation between Liptak and NYDEC engineer and Regional Manager, Mr. Russell Huyck, during which Mr. Huyck noted that he had not required excavation under the building. (Tr. 146-52.) It is not clear from the record to what extent NYDEC would excavate the property. That decision would no doubt be effected by both its opinion regarding the level of contamination under the building and its own interpretation of the term "feasibility". As the NYDEC has declined throughout the course of this litigation to make a recommendation as to the extent of the remediation required, the defendant may not rely on the reported conversation to state the NYDEC position that Liptak's proposal is unreliable.

obligation to do the cleanup. Logically, financially responsible parties are more likely to be willing to compromise the goal of a pre-spill condition for one that meets the NYDEC standards than pay for further remediation to pre-spill conditions. It is true that plaintiff is in an unusual position in seeking remediation of a property to a pre-spill condition, which is provided under the applicable law, without being the party responsible for the cost. Logically, that unusual circumstance would likely trigger a call for remedies beyond what would be acceptable as a settlement to most parties. Thus, the irregularity of the measure is not dispositive on the issue of its feasibility. Here, the question of feasibility remains one for the jury.

Considering that Liptak repeatedly refers to the plaintiff as an innocent party in suffering contamination, Exxon characterizes his unusual excavation recommendation as the result of bias in favor of the plaintiff, which renders his opinion unreliable. This argument is rejected. Liptak has simply recommended a measure in light of plaintiff's position under the applicable law – being a non-financially responsible party who is not willing to settle for NYDEC–approved conditions as opposed to pre-spill conditions.

Liptak's testimony and CAP will not be precluded as unreliable because of his atypical excavation recommendation or any alleged bias.

**b. Methodology**

Defendant also attacks Liptak's testimony and CAP on grounds that he misapplied remediation methodology in accordance with industry standards and that he committed certain errors, which will be noted below.

First, Exxon complains of Liptak's reliance on TAGM 4030 in formulating his CAP. Defendant argues that it is not relevant to the instant property because its goal is not a pre-

spill condition. Defendant also hints that TAGM 4030 relates to NYDEC contaminations classifications which may not be applicable here. (Tr. 188.)

Liptak testified that he reviewed TAGM 4030 in preparing his CAP, and, he also noted in response to a question, that "cost is one of the last things you look at in the TAGM [4030]." (Tr. 21, 51, 60.) That is all he said about TAGM 4030, and it is not cited in his CAP. Without further direction from the defendant, it is difficult to imagine how his review of a NYDEC document which reveals the NYDEC's hierarchy of remediation technologies could render his expert opinion unreliable. The fact that the ultimate goal of pre-spill conditions is more stringent that the goal of TAGM 4030 does not render information regarding the nature and application of the remediation techniques considered in the document irrelevant or misinforming. Moreover, the fact that Liptak reviewed the document and then recommended its least preferred remediation method does not render his opinion unreliable. TAGM 4030 was one document he reviewed, which he thereafter declined to cite.

Second, defendant argues that Liptak misapplied the Federal Matrix. It has thirteen factors and he considered four. It uses "better, average, or worse" ratings and he used numerical values (1-10) to arrive at numerical quotients for each method he evaluated. As noted, Liptak relied on several sources not just the Federal Matrix. To the extent that the matrix was considered, the CAP states that its screening process was "based upon" the Federal Matrix and, in the next sentence, that the matrix [he] used for comparison of the remedial alternatives was provided in the report. (CAP 14.)

There is no apparent methodological problem in Liptak's use of the Federal Matrix as a guide. Defendant had the opportunity to question him as to his CAP's screening matrix – notwithstanding his resistance to acknowledging the hard copy version available at the

hearing - and failed to demonstrate any problem in his scientific methodology. Liptak's matrix address four factors; effectiveness, reliability, cleanup time and overall costs. (CAP 15.) These factors are four of the thirteen listed in the Federal Matrix. The defendant has not asserted that each factor must be considered in order to rely on the matrix for guidance, and several of the factors are not of the sort Liptak would be expected to address in his CAP– such as community acceptability. Nor is his use of numerical values in rating or scoring the remedial alternatives necessarily inconsistent with the matrix.

Third, Exxon asserts that Liptak failed to consider viable alternatives to excavation. This is simply not true. He considered enhanced natural attenuation and horizontal drilling and deemed them ineffective. (Tr. 62-64.) Further scrutinizing his rejection of horizontal drilling, Exxon also notes his inability at the hearing to recall whether the horizontal drilling alternative is included in the Federal Matrix he relied on, and points out that it is actually included. Presuming the oversight, the error is not significant enough to negate the grounds for his opinion that excavation is superior to horizontal drilling in this case. See Amorgianos, 303 F.3d at 267 ("The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions" quoting In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 746 (3d Cir. 1994)).

Finally, Exxon cites General Electric Company v. Joiner, 522 U.S. 136, 146 (U.S. 1997), and argues that Liptak's conclusion that the soil under the restaurant must be excavated does not "fit" the evidence. This is ostensibly because there is insufficient evidence of contamination under the restaurant. Defendant quotes Joiner as follows:

> Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the

> expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

Id. at 146. There is no analytical gap between Liptak's conclusion and the fact of contamination. The conclusion is based on his interpretation of the soil boring data and testing conducted at the site. It is noted that defendant does not attack the underlying sampling data on which he relies or his interpolation of the data. Moreover, plaintiff points to statements by defendant's expert Peter Robelen and NYDEC's expert Ronald Ashburn which also note at least some level of contamination under the building. (Hobbs June 21, 2005 Aff., Ex D. Ausburn Deposition, p. 156-57; Plaintiff's Daubert Ex. 10, Robelen Aff, May 16, 2003 ¶ 2.) In fact, defendant acknowledges some level of contamination under the building in that it intends to remediate under the buildings by way of horizontal drilling.

The fact of contamination is not disputed and accordingly there is no gap in Liptak's analysis regarding the existence of the contamination. The dispute is the level of contamination, and the feasibility of excavating under the restaurant in addressing the damage to the property. "As the Supreme Court has explained, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" Amorgianos, 303 F.3d at 268 (quoting Daubert, 509 U.S. at 596).

**C. Plaintiff's Expert – Kenneth Coleman**

Lambrinos intends to offer the testimony of Kenneth Coleman on the issue of the value of his real property, land and improvements on the property. More specifically, plaintiff intends to offer the evidence of the property value absent the environmental damage in case

the property is not to be restored to pre-spill condition.[9] Defendant argues that his testimony and his Appraisal Report must be precluded pursuant to Rule 702 and Daubert.

Fulfilling the Daubert gatekeeping role involves an initial consideration of Fed. R. Evid. 401 as to "whether proffered expert testimony is relevant, i.e., whether it 'has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Amorgianos, 303 F.3d at 265 (quoting Campbell v Metropolitan Casualty and Ins. Company, 239 F.3d 179, 184 (2d Cir. 2001)). Of course, "[e]vidence which is not relevant is not admissible." Fed. R. Evid. 402. The Appraisal Report is dated October 18, 1999 and is simply too outdated to be probative as to the value of the property seven years later, in 2006. The Appraisal Report will not be admitted at trial.

**D. Plaintiff's Expert – Eric Keysor, CPA**

Plaintiff intends to offer the testimony and reports of Eric Keyser, CPA ("Keysor"), to aid the jury in determining the business interruption damages due to business loss during the remediation of the property. Among other things, defendant asserts that Keyser's analysis is unreliable because he relied on data provided by plaintiff. However, it was reasonable for Keyser to rely on the information provided by Lambrinos in preparing his report in the context

---

9

If it is established that despite efforts to clean up property after an oil spill, the premises cannot be restored to their pre-spill condition, "the proper measure of damages is the total amount of the diminution in value plus the costs of repairs." In determining whether a diminution in the value of the premises has occurred in an environmental contamination case, the court may consider evidence as to whether the "stigma" caused by the oil spill has had an impact on the value of the subject property

Turnbull v. MTA N.Y. City Tr., 28 A.D.3d 647 (N.Y. App. Div. 2d Dep't 2006).

of their professional relationship. Keyser has substantial of experience with Lambrinos' and the Restaurant's finances, as he has prepared their tax returns for more than a decade. The remainder of defendants' complaints go to the weight, not the admissibility, of Keyser's testimony and may be adequately addressed through cross-examination.

**E. <u>Plaintiff's Expert – Oscar R. Harmon, Ph. D.</u>**

Oscar R. Harmon, Ph.D ("Harmon"), is a consulting economist employed as an Associate Professor at the University of Connecticut. He issued two reports regarding the amount of income plaintiff Lambrinos would be expected to earn through the operation of the restaurant until retirement. The purpose of the calculations is to determine the amount of money Lambrinos would lose should he cease to run the restaurant. There is no assertion in the record that the restaurant will be closed permanently due to the contamination on the property. Harmon's testimony is not relevant in that it addresses a question which need not be considered in determining plaintiff's damages. Defendant's motion to exclude Harmon's reports and testimony will be granted.

**F. <u>Plaintiff's Expert – Ronald Ausburn</u>**

Ronald Ausburn ("Ausburn"), employed by Empire Geo Services, now Maxim Technologies, was retained by NYDEC to determine the amount and type of contamination at the site. Exxon argues that Ausburn's testimony must be limited to his field of expertise – geology and hydrology – and any testimony in the areas of remediation and cleanup, remedial systems, MBTE and age dating of petroleum must be excluded. Plaintiff responds that Ausburn is not being offered as an expert in those areas. Ausburn's testimony at trial will be limited accordingly.

**G. Defendant's Experts – Peter G. Robelen and Albert Wilson**

Exxon intends to offer the testimony of Peter G. Robelen of GeoServices, Ltd. ("Robelen"), and the remediation plan he prepared at trial. (Docket No.104, Ex. N, Site Activity Report and Remedial Action Plan.) The testimony and report are offered as a proposed remediation plan addressing the type and scope of the remediation required. Exxon intends to offer the opinion of Albert R. Wilson, CRE (Counselor of Real Estate) ("Wilson") to rebut Lambrinos' claim that his restaurant business has declined due to the knowledge of petroleum contamination under his property and that he will incur significant business interruption and additional losses as a result of the site remediation.

As defendants point out, plaintiff's motion does not address the Daubert standard for evaluating expert testimony. Rather, plaintiff argues that the testimony is inadmissable because Robelen's plan does not propose to return the property to pre-spill condition. Indeed, the plan states its objective as addressing the soils at the site that exceed TAGM 4046 standards. Id. at 4. Plaintiff argues that the plan and testimony are inadmissible because they are introduced to demonstrate an improper legal standard. This argument is rejected.

The issue for trial is the scope of remediation at the site. The jury must consider whether it is feasible to return the site to pre-spill conditions and, if not, what the scope of the remediation should be, and the damages in accordance with whatever determination is made. Defendant expert opinions which express contrary views as to feasibility and damages are not inadmissible as a matter of law, but evidence that presents issues of fact for a jury. Plaintiff's motion to exclude the remediation plan and testimony of Robelen and the testimony

of Wilson on grounds that they are introduced to demonstrate an improper legal standard will be denied.

**H. Other Pending Motions**

By letter-brief dated July 22, 2005, Exxon submitted a motion in limine listing thirteen issues for consideration. (Docket No. 108, Motion In Limine to Bifurcate the Trial of Plaintiff's Claim for Punitive Damages and to Bar Other Certain Irrelevant Evidence.) Thereafter, the litigation focus shifted to a site visit, a settlement conference and the Daubert hearing. Plaintiff's have not responded to this pre-trial motion. Decision as to the issues raised is reserved pending plaintiff's response. As trial in this matter is schedule for November 6, 2006, plaintiff is directed to respond to defendant's July 22, 2005, motion in limine on or before September 1, 2006.

## IV. CONCLUSION

Plaintiff's expert Alan Liptak's CAP and testimony will be admitted. His opinion is not unreliable due to the rarity of the remediation measure he recommends. Moreover, his opinion is scientifically valid and not the result of bias. Coleman's proffered Appraisal Report is too outdated to be probative. Keysor's long-term professional relationship with plaintiff provided a proper context for his reliance on information obtained from him in evaluating his business. Ausburn's trial testimony will be limited to areas of geology and hydrology. Harmon's testimony will be precluded as it is addresses issues unrelated to the instant case. The remediation plan and trial testimony Robelen and the trial testimony Wilson will not be precluded on grounds that they are introduced to demonstrate an improper legal standard.

Accordingly, it is

ORDERED that

1. Defendant Exxon Mobil's motion to exclude the trial testimony and CAP of plaintiff's expert Alan Liptak is DENIED;

2. Defendant Exxon Mobil's motion to exclude the trial testimony and Appraisal Report of plaintiff's expert Kenneth Coleman is GRANTED;

3. Defendant Exxon Mobil's motion to exclude the trial testimony and reports of plaintiff's experts Eric Keysor and Ronald G. Ausburn is DENIED;

4. Defendant Exxon Mobil's motion to exclude the trial testimony and reports of plaintiff's expert Oskar R. Harmon is GRANTED;

5. Plaintiff John Lambrinos' motion to exclude remediation plan and trial testimony of defendant's expert Peter D. Robelen and the trial testimony of defendant's expert Albert R. Wilson is DENIED;

6. Plaintiff is directed to respond to defendant's July 22, 2005, motion in limine on or before September 1, 2006. The motion will be taken on submit without oral argument; and

7. The jury trial will commence on November 6, 2006, at 9:30 a.m. in Utica, New York. All pretrial papers shall be filed on or before October 10, 2006.

IT IS SO ORDERED.

David N. Hurd
District Judge

Dated: August 4, 2006
Utica, New York.